## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**RAUL CASTANEDA**,

Plaintiff,

vs.                                                            No. 1:05-cv-1185 MCA/WPL

**CITY OF ALBUQUERQUE,**

Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant City of Albuquerque's Motion for Summary Judgment and Memorandum in Support Requesting Dismissal of Plaintiff's Complaint* [Doc. 45], filed September 14, 2007.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that the Motion should be **GRANTED**.  The four federal claims are dismissed with prejudice. The single state law claim is dismissed without prejudice.

## I.      BACKGROUND

The following facts appear from the record and are essentially undisputed, except where noted.

Plaintiff Raul Castaneda worked for the Defendant City of Albuquerque (City) from 1996 until he was terminated in April 2004.  He was employed in the Street Maintenance Division, which repairs and maintains city streets.  In 2000, Castaneda was promoted to the

position of Street Maintenance Worker II, and became responsible for ordering oil and other lubricants for maintaining the Division's fleet of vehicles.

Castaneda and an individual by the name of Rudy Aragon were the two employees with authority to order supplies for the vehicle maintenance crews. Castaneda testified that a vehicle serviceman or foreman in the Division would inform him when lubricants or supplies were needed. [Doc. 45-2 at 7.] Castaneda would then contact a vendor, and prepare and sign an invoice for the supplies. [Id.] After the supplies were ordered, he would either pick them up or have them delivered by the vendor. [Id.]

In July 2003, Andre Houle became Acting Manager for the Division. He was promoted to Manager in December 2003. As Acting Manager, Houle was responsible for reviewing invoices submitted by vendors to be paid by his Division.

Shortly after his promotion to Manager, Houle claims he noticed that the Division was ordering amounts of oil and lubricants that appeared excessive for the newer model vehicles the Division had purchased. [Doc. 45-2, ¶ 9.] He inquired with the two maintenance crew foremen and learned that the maintenance crews were using one barrel of oil every three months. [Id. ¶ 11.] Houle thus calculated that the Division should be ordering eight barrels of oil per year. [Id. ¶ 12.] He inquired with an accounting assistant and learned that the Division was in fact ordering approximately three barrels of oil every two weeks. [Id. ¶ 10.] Reviewing the Divisions records for the previous year, Houle discovered that the Division had purchased 82 barrels of oil and that the majority of the invoices appeared to have been prepared by Castaneda. [Id. ¶¶ 13–14.]

2

The parties' characterization of the facts diverges somewhat at this point. Houle claims he concluded, based on his investigation, that internal theft was occurring and that Castaneda might be responsible because his signature appeared on most of the invoices. [Doc. 45-2, ¶¶ 15–16.] Houle claims he confronted Castaneda and asked him if he was stealing from the City. [Id. ¶ 16.] Castaneda denied any involvement. [Id.]

Houle then consulted with Charles Asbury, the Director of Public Works, and they decided to bring in an outside firm to investigate the possible theft. The Department retained Robert Caswell Investigations (RCI) on February 26, 2004. RCI conducted an investigation that included interviews of Castaneda, city employees, and other witnesses. Under questioning by RCI investigators, Castaneda admitted to embezzling drums of lubricant. RCI concluded that Castaneda and Rudy Aragon had obtained lubricants using City funds and sold them to a bus company, and reported their conclusions to Houle. [Doc. 45-2 at 16.]

A predetermination hearing was held, at which Castaneda was represented by counsel. [Doc. 45-2 at 7.] After the predetermination hearing, Houle recommended to Asbury that Castaneda be terminated. Asbury accepted Houle's recommendation and terminated Castaneda citing Castaneda's violation of numerous personnel rules, regulations, and codes of conduct. [Doc. 45-2 at 20.]

Castaneda does not dispute any of these essential facts. However, he claims that he had nothing to do with the theft and that his confession to RCI investigators was made "under extreme duress." Castaneda argues that Houle himself was responsible for the missing oil and conspired to frame him.

3

Castaneda characterizes Houle's investigation as a "sham." According to Castaneda, Houle requested him to investigate why the City was receiving invoices for excessive amounts of lubricants.  [Doc. 55-2 at 10.]  Castaneda says he obtained copies of order tickets from the vendors and observed that the signatures on some tickets were illegible and others appeared to bear forgeries of his own signature.  [Doc. 55-2 at 10–11.]  He turned the documents over to Houle.  [Doc. 55-2 at 11.]

Castaneda claims that Houle twice called him in to discuss the missing oil, and that on each occasion, Castaneda denied any involvement.  [Doc. 55-2 at 11–12.]  According to Castaneda, Houle told him that in the event  anyone asked about the invoices he should say he was not paying attention to what he was signing.  [Doc. 55-2 at 11.]

Approximately two years after he was terminated, Castaneda was indicted along with Rudy Aragon and a third individual who presumably was associated with the bus company. [Doc. 45-2 at 25–49.]  Castaneda subsequently pled guilty for the same conduct alleged here as the basis for terminating his employment with the City.[1]  He maintains, however, that he is innocent, despite the guilty plea, and that he has been the victim of racial and national origin discrimination.  Castaneda asserts various Title VII claims, an equal protection claim, and a state law claim for retaliatory discharge in violation of public policy.  The City moves for summary judgment on all claims.

## II.    SUMMARY JUDGMENT STANDARD

---

[1]Specifically, Castaneda pled guilty to conspiracy to commit larceny over $20,000.  [Doc. 45-2 at 40–42.]

4

Summary judgment under Fed.R.Civ.P. 56(c) "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. . . ." Fed.R.Civ.P. 56(e). Rather, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Id.

In ruling on a motion for summary judgment, the Court does not weigh the evidence and determine the truth of the matter, but simply determines whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Judgment is appropriate as a matter of law if the nonmoving party has failed to make an adequate showing on an essential element of his case, as to which he has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

## III.   ANALYSIS

### A.   Castaneda's Title VII Discrimination Claims

Castaneda claims the City wrongfully investigated him and terminated his employment in violation of Title VII of the Civil Rights Act of 1964. Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

5

employment, because of such individual's race, color, religion, sex, or national origin."  42

U.S.C. § 2000e-2(a)(1).

Castaneda claims he was discriminated against on account of his race (Hispanic) and

national origin (Mexico).  Though Castaneda was born in the United States, his national

origin claim apparently is based upon his belief that he was perceived by co-workers—

including other Hispanic co-workers—as being from Mexico because he spoke Spanish more

often and more fluently than they did.  [Doc. 55-2 at 2.]  For purposes of deciding the City's

motion for summary judgment, the Court accepts these allegations as true and as sufficient

to allege Castaneda's membership in a national origin group.[2]

Because Castaneda relies on circumstantial evidence to establish unlawful

discrimination, the court applies the three-step burden-shifting analysis set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–07, 93 S.Ct. 1817 (1973).  The

aggrieved employee must first establish a prima facie case of prohibited employment action.

EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007).  If the employee makes a prima

facie showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory

reason for the adverse employment action.  PVNF, 487 F.3d at 800.  If the employer meets

this burden, then "summary judgment is warranted unless the employee can show there is a

genuine issue of material fact as to whether the proferred reasons are pretextual."  Plotke v.

White, 405 F.3d 1092, 1099 (10th Cir. 2005).

---

[2]The term "national origin discrimination" is broadly defined and includes discrimination
"because an individual has the physical, cultural or linguistic characteristics of a national origin group."
EEOC Guidelines on Discrimination Because of National Origin, 29 C.F.R. § 1606.1 (2007).

The most general formulation of the prima facie case of discrimination—and the formulation relied upon by the parties—consists of the following elements: (1) the employee belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[3]  Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005).  It is undisputed that Castaneda belongs to a protected class and that he suffered an adverse employment action.  The parties' arguments concern whether Castaneda has raised an inference of discrimination and whether he has met his burden of establishing that the City's reason for terminating him was pretextual.

The City's articulated reason for terminating Castaneda is that it suspected he was involved in workplace theft.  The City states that it relied on the findings of outside investigator RCI, which the City believes substantiated its suspicions that Castaneda had "engaged in a scheme of deceit which violated not only City rules and regulations, but also amounted to criminal acts."  [Doc. 45 at 13.]

Courts have enumerated a variety of circumstances that can give rise to an inference of discriminatory motive, including "actions or remarks by decisionmakers that could be viewed as reflecting a discriminatory animus [and] preferential treatment given to employees

---

[3]There exists some tension in Tenth Circuit case law regarding what a plaintiff must establish as part of his prima facie case of discrimination.  PVNF, 487 F.3d at 800 n.5.  The articulation of a plaintiff's prima facie case may vary depending on the context of the claim and the nature of the adverse employment action alleged.  Plotke, 405 F.3d at 1099.  Whatever the precise elements in any particular case, the critical prima facie inquiry is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination.  Plotke, 405 F.3d at 1100 (quoting Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1227 (10th Cir. 2000)).

outside the protected class." Plotke, 405 F.3d at 1101 (quoting Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 91 (2d Cir. 1996)).

Furthermore, these circumstances may be considered either as part of the prima facie case, or as part of the subsequent analysis into the employer's reasons. Sorbo, 432 F.3d at 1173–74. Regardless, "if the evidence of discrimination/pretext fails as matter of law, summary judgment for the defendant is the proper result." Sorbo, 432 F.3d at 1174. The relevant inquiry concerns the belief of the employer that the employee engaged in misconduct. Sorbo, 432 F.3d at 1178.

Castaneda attempts to both meet his prima facie burden and to establish pretext with the same evidence: first, with evidence of derogatory name-calling by his co-workers; and second, by allegations that others received preferential treatment. The Court concludes that Castaneda's evidence is insufficient as a matter of law to withstand summary judgment.

## 1.     Derogatory Name-calling

Castaneda claims his co-workers referred to him as "mojado," which is a derogatory term for a Hispanic person who is in the United States illegally. [Doc. 55-2 at 2.] According to Castaneda, his co-workers used this term against him daily, attempting to provoke him, beginning in 1996 and continuing throughout his employment until his termination. [Doc. 55-2 at 3.] In response, Castaneda would either ignore them and go on about his business, or protest that they were using the term with the "wrong guy." [Doc. 55-2 at 2.] He never made a formal complaint, but believes that when his co-workers yelled the term at him in the break room, it could be heard throughout the building and in the foremen's and

superintendent's offices nearby.  [Doc. 55-2 at 2.]

Castaneda says he never complained due to fear of retaliation from co-workers or that "somebody would get in trouble for it."  [Doc. 55-2 at 3.]  He also claims that he mentioned the name-calling to supervisor Ray Baca a couple of times in 1997 or 1998, but apparently, no corrective action was taken.  [Doc. 55-2 at 2–3.]

The Court does not agree that name-calling by co-workers reflects a discriminatory animus on the part of the person who made the decision to terminate him.  Castaneda cites Kendrick v. Penske Transportation Services, Inc. as support for the proposition that "name calling is direct evidence of discrimination." [Doc. 55 at 7.]  In Kendrick, however, there were no allegations of name-calling and the Tenth Circuit did not hold that name-calling is direct evidence of discrimination.

In this context, the Court is concerned with "actions or remarks *by decisionmakers* that could be viewed as reflecting a discriminatory animus[.]"  Plotke, 405 F.3d at 1101 (quoting Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 91 (2d Cir. 1996) (emphasis added)).  It is undisputed that Charles Asbury made the decision to terminate Castaneda.   But Castaneda does not claim that Asbury ever made any race-based remarks, or even that he was motivated by racial bias.   Castaneda focuses on Houle, who he claims initiated the investigation, "then conveniently pointed it to Plaintiff."  [Doc. 55 at 7.]  Houle, however, did not ultimately make the decision to fire him.

The Tenth Circuit recognizes that an employer who acts without discriminatory motive may nevertheless be liable under Title VII if it relied on the say-so of a biased subordinate.

EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 501 F.3d 478, 487–88 (10th Cir. 2006).  To prevail on a subordinate bias claim, a plaintiff must establish  that a "biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action."  BCI Coca-Cola Bottling Co. of Los Angeles, 501 F.3d at 487.  In BCI Coca-Cola, the human resources official who made the decision to terminate that plaintiff had never met him and was not aware that the plaintiff was African-American.  BCI Coca-Cola Bottling Co. of Los Angeles, 501 F.3d at 478.  The Tenth Circuit held, however, that a fact issue was raised as to whether a supervisor who provided input into the decision was biased against minorities.  BCI Coca-Cola Bottling Co. of Los Angeles, 501 F.3d at 487. The plaintiff offered evidence of the supervisor's many race-based remarks directed both at the  plaintiff and at other minority employees.  BCI Coca-Cola Bottling Co. of Los Angeles, 501 F.3d at 489.

Though Castaneda argues that the name-calling is "useful as substantive background evidence showing the Defendant's motivations and actions"[4] [Doc. 55 at 7], he does not claim that the co-workers who called him "mojado" had any involvement in the decision to terminate him.  It is undisputed that Asbury relied on Houle's recommendation, but there is no evidence that Houle was motivated by racial bias or ever used derogatory names or made race-based remarks.  In other words, Castaneda has failed to make any connection between the name-calling and the decision to terminate his employment.  In short, Castaneda has

---

[4]In addition to offering name-calling as evidence to support his claims of discrimination, Castaneda also asserts that name-calling is "actionable in and of itself."  [Doc. 55 at 7.]  However, he has not asserted any cause of action—such as hostile work environment—based solely upon name-calling.

failed to proffer any evidence that either Asbury or Houle acted with a discriminatory motive.

### 2.    Similarly-situated employees

Castaneda also attempts to establish his prima facie case, as well as pretext, by claiming that similarly-situated employees received preferential treatment.  A plaintiff seeking to show pretext "often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness. Kendrick, 220 F.3d at 1230.  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1120 (10th Cir. 2007) (quoting Arambur v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)).  "It is up to the plaintiff to establish not only that differential treatment occurred, but also to rule out nondiscriminatory explanations for the differential treatment."  Timmerman, 483 F.3d at 1121.

Castaneda's claims of disparate treatment relate to three incidents: (1) the missing oil; (2) an incident involving falsification of time cards; and (3) an incident involving a stolen chain.  He has failed to meet his burden with respect to any of these incidents.  There either is an absence of evidence or, the differential treatment, if any, is explained by a nondiscriminatory motive.

First, he argues that four other individuals that might have been involved in the scheme to steal oil were not disciplined in a similar manner.  These individuals are Andre Houle, Rudy Aragon, Bill Pedigo, and Andrew Sanchez.

Houle is not similarly situated.   Castaneda claims he was framed and made the scapegoat, and that Houle was actually responsible for the missing oil.  [Doc. 55 at 2–3.]  He has presented no evidence of a frame up, however, and his subjective belief of a conspiracy against him is insufficient to raise a fact issue.  Kendrick, 220 F.3d at 1231 n.11.  The only evidence in the record tends to refute Castaneda's conspiracy theory.

Castaneda admitted to the hired investigators that he had stolen City property and later plead guilty to the same conduct.   Though he now claims he did not embezzle from his employer, his guilty plea may preclude him from denying criminal conduct for purposes of subsequent civil litigation.  See, e.g., Appley v. West, 832 F.2d 1021, 1026 (7th Cir. 1987) (holding that a guilty plea conclusively establishes for purposes of a subsequent civil proceeding that the defendant engaged in the criminal act for which he was convicted); see also Refined Sugars, Inc. v. S. Commodity Corp., 709 F.Supp. 1117, 1121 (S.D. Fla 1988) (finding defendant's previous guilty plea collaterally estopped him from denying criminal conduct in subsequent civil litigation).

 Castaneda claims that because Houle authorized payment on the invoices, he must have been responsible for the theft.  Specifically, Castaneda states that Houle "knew something was going on, and he authorized payment on those [invoices.]"  [Doc. 55-2 at 6.] However, merely because Houle's signature was required to authorize payment of invoices does not raise an inference that he was complicit in the theft.  Castaneda was responsible for ordering the supplies, preparing the invoices and picking up the oil or arranging for delivery. Furthermore, Houle only became responsible for reviewing invoices beginning in July 2003.

[Doc. 45-2, ¶ 8.]  The theft, on the other hand, had allegedly been occurring since July 2000 [Doc. 45-2, at 25–26], which makes it appear less likely that Houle was the perpetrator.

Castaneda claims that Houle directed him to say that he was not paying attention when he signed the invoices.  [Doc. 55-2 at 12.]  Castaneda offers this as evidence that Houle himself was involved in the theft.  This evidence, though undisputed, is ambiguous at best and even if viewed in the light most favorable to Castaneda, does nothing to indicate that the investigation or termination of his employment was racially-motivated.  To the contrary, the record supports the conclusion that the City had credible information implicating Castaneda in the theft of City property and acted appropriately on this information.

In short, based upon the evidence of record, the fact that Castaneda was terminated while Houle was not can be explained by nondiscriminatory reasons.  Whereas Castaneda admitted involvement in the oil-stealing scheme, he has offered no evidence that Houle was involved, or that the City should have believed that he was involved.

Rudy Aragon, like Castaneda, was investigated and eventually indicted for conspiring to steal City property.  [Doc. 45, ¶ 46; doc. 45-2 at 35–42.]  Castaneda argues that Aragon received preferential treatment because Aragon was "allowed" to resign, whereas Castaneda was terminated.  [Doc. 55, ¶ 46.]  Statements of counsel are not summary judgment evidence, however,  Sorbo, 432 F.3d at 1175, and Castaneda admits he does not actually know whether Aragon quit or was terminated.  In his deposition, Castaneda testified:

> Castaneda:    In regard to Rudy Aragon, Rudy Aragon was not terminated from the City of Albuquerque.

| | |
|---|---|
| Counsel: | Didn't he quit? |
| Castaneda: | During the investigation? |
| Counsel: | Right.  Didn't he quit? |
| Castaneda: | *I have no idea.  I don't know if he did.*  Based on the fact that they indicted him, I feel he should have been terminated. |

[Doc. 55-2 at 8 (emphasis added).]  The only competent evidence on this issue is the affidavit of Andre Houle which states that Aragon resigned before RCI completed its investigation and the City therefore was unable to take any disciplinary action against him. [Doc. 45-2, ¶ 21.]  Furthermore, Castaneda has failed to offer any evidence as to what the City knew or believed about Aragon that would require it to discipline him in a similar matter.  The City began its investigation into the missing oil in early 2004.  Aragon's subsequent indictment over a year later is not information that the City had during the investigation that led to Castaneda's termination in April 2004.  In short, Castaneda has failed to show that Aragon was similarly-situated, or that he received preferential treatment.

Castaneda also argues that Bill Pedigo and Andrew Sanchez, the two maintenance crew foremen that ordered oil from him, were not investigated and disciplined in a manner similar to himself.  [Doc. 55 at 3; doc. 55-2 at 12.]  Castaneda has simply offered no evidence that would enable the Court to determine whether these two individuals were similarly-situated and received preferential treatment.

In his interrogatory responses, he claims that the City failed to use footage from surveillance cameras at satellite locations in its investigation to identify the "correct culprit."

14

[Doc. 55-2 at 12.]  The Court declines to accept Castaneda's unsupported and self-serving interrogatory answers as informative on this issue.  He has failed to lay an adequate foundation demonstrating that he has personal knowledge of the location of the surveillance cameras or the scope of the City's investigation.  H.B. Zachry Co. v. O'Brien, 378 F.2d 423, 425–26 (10th Cir. 1967) (stating that answers to interrogatories are subject to the same infirmities as an affidavit would be under Rule 56(e)).  Even if the Court were to accept Castaneda's interrogatory answers as competent on the issue, he still falls far short of demonstrating that Pedigo and Sanchez were similarly-situated.

Castaneda also points to an incident in which several members of a night crew in his department were caught committing time card fraud. [Doc. 55 at 5.]  His allegations of time card fraud are roughly corroborated by Houle's affidavit which states that "in 2002 seven employees who worked the night shift as street sweepers were found by the Department to have committed time-card fraud by clocking each other's cards when the employees were not present at the work site."  [Doc. 45-2, ¶ 25.]  Houle's affidavit further states that the employees were Hispanic or black and that all were disciplined.  [Doc. 45-2, ¶¶ 26–27.] Five of the employees received suspensions ranging from five days to 45 days, one employee was demoted and suspended, and one was terminated.  [Doc. 45-2, ¶ 27.]

Castaneda states conclusorily that the "treatment [he] received, when compared to these coworkers, is clearly disparate."  [Doc. 55 at 9.]  To demonstrate pretext through differential treatment, however, it must be shown that the employees violated rules of "comparable seriousness."  Swackhammer, 493 F.3d at 1167–68 (citing Kendrick, 220 F.3d

at 1230).

Castaneda has failed to show that the time card fraud committed by the night shift is in any way comparable to his own misconduct.  On the one hand, several members of the night shift allegedly submitted false time card information, presumably inflating their hours over a three-month period.  On the other hand, Castaneda is alleged to have conspired with both a co-worker and an independent bus company to embezzle tens of thousands of dollars worth of City property over at least a four-year period.  The conduct at issue is not comparable.  Furthermore, Castaneda has failed to provide any information regarding the financial loss to his employer caused by the time card fraud, as compared to the loss caused by his own conduct.  And, it is undisputed that at least one member of the night shift involved in the time card fraud was, like Castaneda, terminated.  Accordingly, Castaneda has not established that these employees were similarly-situated or that they received preferential treatment.

Finally, Castaneda claims a white employee caught stealing a chain from the landfill received only a suspension.  [Doc. 55-2 at 5.]  Stealing a chain, however, is not misconduct that is in any way comparable to the embezzlement that allegedly occurred in this case.

In short, the differential treatment, if any, in connection with the time card fraud and chain-stealing incidents is explained by a nondiscriminatory motive, and thus is insufficient to create an inference of discrimination or to raise a fact issue as to pretext.  Swackhammer, 493 F.3d F.3d at 1168.  The difference in treatment is due to the difference in the severity of the violations.

Castaneda's race and national origin discrimination claims fail because there is "abundant and uncontroverted independent evidence that no discrimination...occurred." Swackhammer, 493 F.3d at 1168.  Furthermore, there is no evidence that Defendant's stated reason for terminating Castaneda is untrue.

 Castaneda has failed to raise an inference of discrimination or to demonstrate pretext.

### B.    Title VII Retaliation

Castaneda also asserts a claim for Title VII retaliation.  Title VII forbids employers from retaliating against an employee who takes action in opposition to a discriminatory practice.  42 U.S.C. § 2000e-3(a).  Title VII retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting test.  Somoza v. Univ. of Denver, No. 06-1488, 2007 WL 4465244, at *2 (10th Cir. Dec. 21, 2007).  In order to establish a prima facie case of retaliation, an employee must show: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action.  Timmerman, 483 F.3d at 1122–23.

Castaneda claims he engaged in protected activity when he asked his co-workers not to refer to him as "mojado" and when he complained to his supervisor about the practice.[5] [Doc. 55 at 9.]  According to Castaneda, he last complained to supervisor Ray Baca in "1997 or 1998."  [Doc. 55-2 at 2–3.]  The record regarding the timing of his alleged complaints to

---

[5]Castaneda has changed his theory of retaliation.  In his Complaint, he claims the protected activity was "assisting Defendant in its investigation of the [missing oil]."  [Doc. 1, ¶ 30.]  Castaneda has presented no evidence to support this theory.  In any event, Castaneda was not opposing a discriminatory practice when he assisted in the investigation, and thus it could not serve as the basis for a Title VII retaliation claim.  See Petersen v. Utah Dept. of Corrs., 301 F.3d 1182, 1188 (10th Cir. 2002).

co-workers is less clear.

The causal connection required for a prima facie retaliation case under Title VII may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.  O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation."  O'Neal, 237 F.3d at 1253.

Assuming that the activities alleged by Castaneda are protected for Title VII retaliation purposes, his claim nevertheless fails on the causation element.  Given that the Tenth Circuit holds a three-month period is insufficient to establish causation, the six or seven year period that elapsed in this case is simply too remote in time to show causation. See O'Neal, 237 F.3d at 1253.

Castaneda does not meet his prima facie case with claims that he complained to co-workers because Castaneda fails to specify when he made the complaints.  It also is far from clear that Castaneda engaged in a protected activity when he spoke with his co-workers. Castaneda's response to the name-calling was to say:

> Whoever said that?  I don't know who you guys are talking to, but you're talking to the wrong guy.

[Doc. 55-2, at 2.]  It is doubtful that this vague statement was sufficient to put anyone on notice that Castaneda was complaining of national origin discrimination.  Petersen, 301 F.3d at 1188 (concluding that absence of reference to unlawful discrimination precluded

retaliation claim because employer could not know that employee was engaging in protected opposition).

Given the poverty of evidence, the Court declines to find that Castaneda has made out a prima facie case of retaliation.  Even assuming that Castaneda could establish a prima facie case, the claim fails at the third step of the *McDonnell Douglas* analysis.  As discussed above in connection with his discrimination claims, he cannot show that the City's stated reasons for terminating him are a pretext for a retaliatory motive.

### C.     Equal Protection

Castaneda claims that the City's investigation and termination of his employment also amount to a violation of his Fourteenth Amendment equal protection rights.  "The essence of  the equal protection requirement is that the state treat all those similarly-situated similarly."  Bartell v. Aurora Pub. Schs. 263 F.3d 1143, 1149 (10th Cir. 2001) (quoting Zeigler v. Jackson, 638 F.2d 776, 779 (5th Cir. 1981)) (quotation marks and brackets omitted).

The Equal Protection clause shields members of an identified class from discriminatory treatment.  Bartell, 263 F.3d at 1148–49.  The Tenth Circuit also recognizes equal protection claims by individuals without identification of a class if the individual has been injured by intentional or purposeful discrimination—so-called "class of one claims." Bartell, 263 F.3d at 1148–49.

Castaneda contends that he is a "class of one" and that his termination was due to "some animosity on the part of Defendant."  [Doc. 55 at 10.]  To prevail on a class of one

claim, the plaintiff must show that "the action taken by the state...was a spiteful effort to 'get' [him] for reasons wholly unrelated to any legitimate state objective." Bartel, 263 F.3d at 1149. As with any equal protection claim, the plaintiff must also show that he was treated differently than another who is similarly situated. Bartel, 263 F.3d at 1149.

Castaneda's equal protection claim fails because it rests on nothing more than bare assertions that the City harbored an irrational animosity against him. Defendant was presented with credible information that Castaneda had perpetrated an embezzlement scam over a course of several years. An outside investigator substantiated the City's suspicions and Castaneda admitted his involvement. Accordingly, the City's decisions to investigate Castaneda and to terminate him were neither arbitrary nor irrational.

Castaneda's claim that he was treated differently than similarly situated employees is without merit. As discussed above, in each instance Castaneda asserts that others received preferential treatment, there is either a complete lack of evidence to support the assertion, or the City had a demonstrably rational basis for treating the other employees differently.

### D.    Retaliatory Discharge in Violation of Public Policy

The City asserts that it is also entitled to summary judgment on Castaneda's state law claim for retaliatory discharge in violation of public policy. Because this claim arises under state law, it is before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a). "The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the claim raises a novel or complex issue of State law... or...the district court has dismissed all claims over which it has original

jurisdiction."  28 U.S.C. § 1367(c)(1), (3).

Having granted summary judgment on all of Castaneda's claims arising under federal law, the Court declines to exercise supplemental jurisdiction over his remaining state law claim.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  In so declining, the Court has considered whether the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.

In this regard, the Court notes that the factual development and briefing are inadequate to enable the Court to address the state law claim.  Absent from the record, for example, is any indication as to whether Castaneda was an at-will employee.  Silva v. Am. Fed'n of State, County & Mun. Employees, 37 P.3d 81 (N.M. 2001) (holding that plaintiff who is not an at-will employee may not pursue an action for retaliatory discharge).

Furthermore, the public policy at issue is unclear.  Several sources can serve as the basis for a claim of retaliatory discharge, including  legislation or the reporting of illegal activity.  Garrity v. Overland Sheepskin Co. of Taos, 917 P.2d 1382, 1386 (N.M. 1996).  Castaneda relies on none of these and the Court concludes his apparently novel claim that investigating the conduct for which he subsequently plead guilty furthers the public policy of the State of New Mexico is an issue best left to the state courts.  Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling

reasons to the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478

(10th Cir. 1990).  Accordingly, the state law claim should be dismissed without prejudice.

## IV.    CONCLUSION

Castaneda has failed to meet his summary judgment burden with respect to his Title

VII discrimination and retaliation claims.  He also has failed to meet his summary judgment

burden with respect to his equal protection claim.  The Court concludes that these federal

claims should be dismissed with prejudice and declines to exercise supplemental jurisdiction

over the state law claim for retaliatory discharge in violation of public policy.

**IT IS, THEREFORE, ORDERED** that *Defendant City of Albuquerque's Motion for*

*Summary Judgment and Memorandum in Support Requesting Dismissal of Plaintiff's*

*Complaint* [Doc. 45] is **GRANTED.**  Counts I through IV are dismissed **with prejudice**.

Count V is dismissed **without prejudice.**

**SO ORDERED** this 22nd day of January 2008**,** in Albuquerque New Mexico.


**M. CHRISTINA ARMIJO**
United States District Judge